1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8

| | |
|---|---|
| CLARENCE WYATT, | CV F  05-00185 AWI SMS HC |
|                  Petitioner, | FINDINGS AND RECOMMENDATIONS REGARDING AMENDED PETITION FOR WRIT OF HABEAS CORPUS |
|    v. | [Doc. 18] |
| ANTHONY A. LAMARQUE, | |
|             Respondents. | |
| _____/ | |

9
10
11
12
13
14
15
16
17

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND[1]

18
19
20
21
22
23

On March 17, 2003, following a trial by jury in the Fresno County Superior Court, Petitioner was convicted of robbery (California Penal Code § 211)[2], attempted robbery (§ 664/211), and assault with a deadly weapon (§ 245(a)(1)), including numerous enhancements. Petitioner was sentenced to state prison for a total of fifty years to life, plus an indeterminate term of eleven years.  (CT 284-285.)

24
25

On or about December 5, 2003, Petitioner filed an opening brief in the California Court of Appeal, Fifth Appellate District.  (Lodged Doc. No. 1.)

26
27
28

---

[1] This information is derived from the amended petition for writ of habeas corpus and Respondent's answer.

[2] All further statutory references are to the California Penal Code unless otherwise indicated.

1    On August 25, 2004, after briefing by the parties, the Fifth District Court of Appeal

2  affirmed the conviction in its entirety.  (Lodged Doc. No. 4.)

3    On September 9, 2004, the Fifth District Court of Appeal denied a Petition For

4  Rehearing, filed on or about September 2, 2004.  (Lodged Doc. No. 5.)

5    On September 28, 2004, Petitioner filed a petition for review with the California Supreme

6  Court.  The petition was denied on November 10, 2004.  (Lodged Doc. No. 6.)

7    On February 4, 2005, Petitioner filed the instant federal petition for writ of habeas corpus

8  in this Court.  (Court Doc. 2.)

9    On April 26, 2005, the Court directed Respondent to file a response to the petition.

10  (Court Doc. 19.)

11    On June 3, 2005, Respondent filed a motion to dismiss the petition for failure to exhaust

12  the state court remedies.  (Court Doc. 23.)

13    On August 2, 2005, the undersigned issued Findings and Recommendations

14  recommending that Respondent's motion to dismiss be granted, and that Petitioner be granted

15  leave to file a motion to withdraw the unexhausted claims or to file an amended petition deleting

16  the unexhausted claims.  (Court Doc. 26.)

17    On August 8, 2005, Petitioner filed a motion to withdraw the unexhausted claims.  (Court

18  Doc. 27.)

19    On September 15, 2005, Judge Ishii adopted the Findings and Recommendations, granted

20  Petitioner's request to withdraw the unexhausted claims, and denied Respondent's motion to

21  dismiss as moot.  (Court Doc. 29.)

22    On October 5, 2005, the Court directed Respondent to file a further response to the

23  petition.  (Court Doc. 30.)

24    Respondent filed an answer to the petition on November 16, 2005, and Petitioner filed a

25  traverse on December 16, 2005.  (Court Docs. 32, 35.)

26                    <u>STATEMENT OF FACTS</u>[3]

27  ───────────────────

28      [3]  The Court finds the Court of Appeal correctly summarized the facts in its August 25, 2004, opinion.
    Thus, the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate District.
    (Lodged Doc. No. 5.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

   On April 3, 2002, Traci Long was a restaurant manager for Taco Bell. As one of her regular duties was to take deposits to the bank, she went to the Bank of America branch at 5708 East Kings Canyon Avenue at approximately 9:45 that morning. As she approached the door to the bank in her Taco Bell uniform, she noticed a person standing in the alcove outside the bank entrance. He was African-American, around five feet three inches tall, and with a medium build. A beard and sideburns were painted on his face with what looked like black shoe polish. Long estimated his approximate age as between 25 to 30 years old, although it was difficult to tell because of the substance on his face. He was wearing a black hat with a bill on the front; dark pants; and a tan, button-down, short-sleeved shirt with white pinstripes that was like a uniform top, possibly from McDonald's. He was not wearing glasses, and his eyes were open very wide. His hair was short; because of the substance on his face, Long was unable to tell whether he had facial hair.[4] Long exchanged smiles with him as she entered the bank. She did not recall anything unusual about his teeth, and in fact was not sure whether he showed his teeth.[5]

   Long was in the bank for five to seven minutes, during which time she deposited money she had been carrying in a tan bank bag. The bank made change for her, so when she exited, she had $40 in four rolls of quarters, packaged in see-through plastic, in the bag. As she left, she could see the feet of someone in the alcove. She was almost to her car when she heard footsteps running up behind her. She turned; in front of her was the man she had seen as she entered the bank. He lifted up his shirt and showed her a gun in the waistline area of his pants. He told her to give him the bag; when she stuck it out to him, he grabbed it and told her to get in the car. She obeyed, and he told her to drive off. As she did so, she saw him standing where he had when he robbed her. He appeared to be staring across Kings Canyon.

   Long telephoned 911 and then waited for the police to arrive. The first officer directed her back to the bank, where she saw an older man who was bleeding from the head. At the bank, she gave a description of the robber to a police officer. Seven to ten days later, she was shown a photographic lineup. There were two men of whom she was unsure, so she commented that it would be easier if they had beards. The detective drew a fake beard on a piece of paper and placed it over each photograph. She then selected number 3 [Petitioner]. She was about 80 percent sure of her selection. At trial, she identified [Petitioner] as the robber. She was "absolutely positive" of her identification because of his eyes, which were the only thing she looked at when she was face to face with him.

   At approximately 10:00 a.m. on April 3, Delaouss Cox, who was 80 years old at the time of trial, went to the Bank of America on East Kings Canyon and cashed some checks. After he left the bank, he was sitting in his car when a man walked up, laid a gun in his lap, and demanded his money. When Cox tried to talk the man out of robbing him, the man said he would give Cox five, and if he did not get the money by then, he would "hurt [Cox] bad." The man started counting; when he reached three, he struck Cox over the head with the gun, causing a large gash on Cox's left temple. Cox either hit or kicked the man, who ended upon the ground.[6] The man then got up and ran across Kings Canyon. He did not get any of Cox's money.

---

   [4] Fresno Police Detective Gines, who interviewed Long, recalled her saying that the man had a light mustache.

   [5] [Petitioner] has significant gaps in his upper front teeth.

   [6] Although the mans's mouth was open, Cox did not notice anything unusual about his teeth. He did not notice whether the man had anything on his face. Cox did not look; he simply reacted.

Cox went back inside the bank and had an employee contact the police. Cox described the man as African-American, 18 to 20 years of age, 5 feet 6 inches to 5 feet 8 inches tall, and 140 to 160 pounds in weight.[7]  Cox did not notice what he was wearing or whether he had any kind of markings or scarring or makeup or facial hair.  Cox was subsequently shown photographs; while he was able to eliminate some, he was unsure of others.[8]

Around 10:00 a.m. on April 3, Rufino Almeras had just pulled his car around the corner of the bank when he heard a car horn.  He saw a man sitting inside the car and another one standing outside it.  The man standing was African-American; as Almeras watched, he took off running, and then the older man got out of the car and walked toward the bank.  There was blood on his head.  At no time did Almeras see the African-American man on the ground, although he could not see the two men at first because he was at the ATM machine.

The African-American man ran across Kings Canyon and behind an office complex.  Almeras followed.  He did not see the man almost get hit by a vehicle.  He lost sight of the man for perhaps two minutes, and then saw him again in a parking lot.  The man went behind some trees and an electrical transformer for a couple of minutes, then started running again.  He ran down an alley in an apartment complex and Almeras lost him.  This was about 10 minutes after Almeras first saw the man at the bank.

When the man ran from the bank, he was wearing dark gray pants and a yellowish shirt.  He did not have anything on his head or any glasses.  Almeras estimated the person was five feet six to seven inches in height.  He was kind of stocky and had a mustache and short hair, and Almeras believed he was in his late 30's or 40's.  Almeras did not see any black paint or polish on the person's face.  However, he had what looked like a brown paper sack in his hand.  He was limping as he ran.[9]  When the man came out of the bushes by the electrical transformer, he was no longer wearing the same clothes.  He now had on green shorts and a yellow T-shirt with short sleeves.  He no longer had anything in his hands.  Almeras was subsequently shown a photographic lineup and was able to identify [Petitioner's] photograph as the man.  He was certain of his identification.  At trial, he identified [Petitioner] as the person he followed.  Almeras was certain of this identification.

Shortly after 10:00 a.m. on a Wednesday in early April, Valerie Pranger had just turned onto Kings Canyon from Sunnyside when she saw someone running as if being chased.  He ran in front of her vehicle, and she slammed on her brakes and almost hit him.  He ran straight across into an apartment complex.  The person had a white to beigeish bag in his hand.  He was African-American approximately five feet nine inches tall.  He had a medium, muscular build, and medium to short, curly hair.  He had nothing on his head, and was wearing fluorescent green gym shorts and a bright yellow tank top.  She did not notice anything peculiar about his face, but she only had a quick view of it when he was right in front of her windshield and turned and looked at her.  He appeared to be in his mid-30's, was medium-complected, and had marks along the jaw line that were darker than his skin and could have been facial hair or acne scars.  Pranger subsequently viewed a photographic lineup and identified a photograph of [Petitioner], with 90 percent certainty, as the person who had run across the street.

---

[7]  Cox told Gines the man was possibly in his 30's.

[8]  Accordingly to Cox, he was not shown the same photographic lineup as other witnesses.  Gines disputed this, and said Cox scanned the display of photographs and said he did not see the person.  Cox appeared to Gines to be very nervous.

[9]Almeras told Gines that he limped as if he was tired of running.

4

At trial, she identified [Petitioner] as this person. She was 90 percent certain.

As of April 2002, Stephanie Moreno managed the apartment complex at 5770 East Kings Canyon. There were 112 units in the complex, and Samantha Session was one of the tenants. [Petitioner] was her boyfriend. On a Wednesday in very early April, Moreno saw [Petitioner] walking on the front walkway toward the location of Sessions's mailbox. He was talking to the mail carrier, who was delivering the mail, and kept going back toward Kings Canyon and coming back again. This was around 10:30 a.m. [Petitioner] was wearing green shorts and a yellow short-sleeved shirt and something gray and narrow around his neck.

On Wednesday, April 3, 17-year-old Herminia Sanchez, Moreno's daughter, was standing near the mail area, waiting for her mother. She saw [Petitioner] come from the front of the apartments. He was walking with a little girl who may have been Session's daughter. He did not look like he had just finished running, and Sanchez saw no type of unusual markings on his face. Sanchez did not notice he was limping, although she was not paying much attention to him. He asked for mail, but could not get it because he did not have a key. Then he left and walked back out the front of the complex to Kings Canyon. This took place between 10:30 and 11:00 a.m. [Petitioner] was wearing a yellow jersey-type T-shirt with black stripes on the arms, and green shorts. Sanchez had seen Session wearing sunglasses like those the police subsequently found, but not [Petitioner].

On April 4, Fresno Police Detective Gines interviewed various people in connection in this case, including Almeras. Based on what Almeras told him, Gines went to the transformer and grove of trees at the rear of the complex at 5755 East kings Canyon. He spotted a tan object, which looked like cloth, wedged inside one of the trees.[10] When he reached the tree, he noticed it was hollowed out. Inside the center he could see a tan shirt, what appeared to be a black pair of pants and black baseball hat, and the tip of what appeared to be a semi-automatic weapon. He then requested that an Identification Bureau technician respond. As a result, Laura Lathrop responded to the scene, processed it, and recovered the property. Lathrop seized a shirt, dark pants, sunglasses, a BB pellet gun, a hat, and a portion of a stocking. The items had been stuffed into the pants and shoved down into the base of the tree where the branches sprouted out. Lathrop was unable to recover fingerprints from any of the items.

At the time of these events, Samantha Session lived in an apartment at 5770 East Kings Canyon, Clovis. She and [Petitioner] had been boyfriend and girlfriend since October 2001; the relationship was rocky almost from the start, and by April 2002, she did not want him around. Sometime between the end of March and beginning part of April, she called the sheriff's department from a grocery store near her apartment and asked to have them come and get [Petitioner] because of an angry confrontation she had had with him.[11] When sheriff's officers responded, she told them about a possible robbery, which she understood to have occurred the day before in the area of the Bank of America near her apartment.

[Petitioner] had been spending time at Session's apartment as of the time she understood the robbery to have occurred. The night before she learned of the

---

[10] Fresno Police Officer Lyon and Gines had walked through the area on the day of the robbery and the morning of April 4, respectively, and had seen nothing of interest.

[11] When [Petitioner] was arrested on April 5, Deputy Vang, who booked him, asked his date of birth. Vang noted a birthdate of January 5, 1951, and reported that [Petitioner] was 51 years of age, although he did not look that old to Vang. (Indeed, the complaint in this case, as well as the certified documents from the Department of Corrections, gave [Petitioner's] birthdate as January 5, 1959, which would have made him 43 years old at the time of his arrest.) [Petitioner] told Vang that he was five feet three inches tall and weighed 150 pounds, both of which appeared to be correct.

robbery from [Petitioner], he spent the night there.  He was lying on her sofa around 6:00 a.m. on the day she learned of the robbery.  She went back to bed and next saw him around 10:00 a..m.[12]  She heard some banging from her bedroom window and the front door.  It was [Petitioner]; he was hysterical and told her to let him in.  When she did, she noticed he was dressed in green gym shorts with a white shirt with something on it.  There was black makeup smeared on his face from the sideburns down to the chin. [Petitioner] handed her four rolls of quarters that were wrapped in clear plastic and asked her to get rid of the wrappers.  He showed her a deposit slip and said he had just gotten through robbing a lady at the Bank of America and had gotten the quarters from her.  He said he had used a gun.[13]  He also said he tried to rob an old man there, but the old man would not let go of his bag so [Petitioner] hit him.  When the old man still would not let go, [Petitioner] ran. [Petitioner] said the lady had $1,500 in the deposit bag, which he had intended to get before she went into the bank.  However, because it looked like there was nothing in the bag, he waited until after she came out and missed the money he was aiming for.

[Petitioner] quickly washed his face and shaved and changed clothes.  He said he was going to go walk around to check out the area.  He left with Session's young daughter and returned within 20 to 30 minutes.  Session believed he left around 10:30 and returned close to 11:00.  Session had received her check that day, so they both walked to a nearby liquor store to cash it.  Session gave [Petitioner] money in exchange for the quarters because she needed quarters for laundry.

At the time of the robbery, Session had a McDonald's uniform, as she was getting ready to start her orientation for McDonald's.  She law saw the uniform in her closet the night before the robbery.  She did not see it afterwards.  The uniform consisted of a tan button-up shirt, black pants, and a baseball cap with a McDonald's emblem. [Petitioner] told Session that someone had been following him, and that he had placed her uniform, house key, and the gun in a bush near a building across the street from the bank. [Petitioner] brought the key back when he went out with Session's daughter.

Gines interviewed Session on April5.  From her apartment, he collected a green pair of men's stretch shorts with the name "Wyatt" written on the pant leg, and a black eyeliner pencil that appeared to be broken.  Session said the other piece was missing.  Almeras and Pranger each subsequently identified the shorts.  Gines showed Session some items.  She identified her McDonald's uniform and hat.  At trial, she also identified a part of her pantyhose.  She had been getting ready to throw them away, but [Petitioner] thought they could be of some use and so cut a piece off.  He put it on and practiced being a robber in front of her.  She also identified [Petitioner's] sunglasses, but denied wearing them herself.

(Lodged Doc. 5, Opinion, at 2-9.)

DISCUSSION

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody

---

[12] At some point, she opened the door to leave her room, but he closed it and told her that he needed her to stay in her room.  She subsequently heard the door open and close.  She came out of her room and he was gone.  This might have been around 9:00 or 9:30.

[13] Session knew [Petitioner] had a BB gun.  She last saw him in possession of it less than two weeks before the robbery.

6

pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>,

529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

out of the Fresno County Superior Court, which is located within the jurisdiction of this Court.

28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; <u>Jeffries v. Wood</u>, 114

F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

<u>Drinkard v. Johnson</u>, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

1114 (1997), *overruled on other grounds by* <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S.Ct. 2059

(1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.      <u>Standard of Review</u>

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

custody pursuant to the judgment of a State court only on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with

respect to a state prisoner's claim that was adjudicated on the merits in state court. <u>Williams v.</u>

<u>Taylor</u>, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States;" or "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State Court

proceeding." 28 U.S.C. § 2254(d); <u>Lockyer v. Andrade</u>,123 S.Ct.1166 (2003) (disapproving of

the Ninth Circuit's approach in <u>Van Tran v. Lindsey</u>, 212 F.3d 1143 (9th Cir. 2000)); <u>Williams v.</u>

<u>Taylor</u>, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply

1  because that court concludes in its independent judgment that the relevant state-court decision

2  applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations

3  omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

4        While habeas corpus relief is an important instrument to assure that individuals are

5  constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

6  (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

7  criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

8  Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

9  factual determinations must be presumed correct, and the federal court must accept all factual

10 findings made by the state court unless the petitioner can rebut "the presumption of correctness

11 by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115

12 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day,

13 110 F.3d 1380, 1388 (9th Cir. 1997).

14 C.    Due Process Violation - Shackling During Trial

15       Petitioner contends that his constitutional rights were violated because he was shackled

16 during the trial court proceedings without a showing of manifest need.  (Amended Petition, at 5.)

17       1.    Procedural Default

18       Respondent argues that the instant claim is procedurally defaulted as the state court found

19 the claim to be waived by Petitioner's failure to object in the trial court. (Lodged Doc. No. 5;

20 Opinion, at 11.)

21       A federal court will not review claims in a petition for writ of habeas corpus if the state

22 court has denied relief on those claims by a state law that is independent of federal law and

23 adequate to support the judgment.  A federal court will not review a petitioner's claims if the

24 state court has denied relief of those claims pursuant to a state law that is independent of federal

25 law and adequate to support the judgment.  Ylst v. Nunnemaker, 501 U.S. 797, 801, 111 S.Ct.

26 2590, 2592 (1991); Coleman v. Thompson, 501 U.S. 722, 729-30, 111 S.Ct. 2546, 2553-54

27 (1989); See also Fox Film Corp. v. Muller, 296 U.S. 207, 210, 56 S.Ct. 183, 184 (1935).

28       There are limitations as to when a federal court should invoke procedural default and

8

1   refuse to evaluate the merits of a claim because the petitioner violated a state's procedural rules.

2   Procedural default can only block a claim in federal court if the state court "clearly and expressly

3   states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263, 109

4   S.Ct. 1038,1043 (1989).

5        In addition, a federal court may only impose a procedural bar on claims if the procedural

6   rule that the state used to deny relief is "firmly established and regularly followed." O'Dell v.

7   Thompson, 502 U.S. 995, 998, 112 S.Ct. 618, 620 (1991) (statement of Blackmun joined by

8   Stevens and O'Connor respecting the denial of certiorari); Ford v. Georgia, 498 U.S. 411, 423-

9   24, 111 S.Ct. 850, 857 (1991); James v. Kentucky, 466 U.S. 341, 348-51, 104 S.Ct. 1830, 1835-

10  37 (1984); Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir. 2003).  The state procedural rule used

11  must be clear, consistently applied, and well-established at the time of the petitioner's purported

12  default.  Fields v. Calderon, 125 F.3d 757, 760 (9th Cir. 1997); Calderon v. United States Dist.

13  Court (Bean), 96 F.3d 112, 129 (9th Cir. 1996), *cert. denied,* 117 S.Ct. 1569.

14       In Wainwright v. Sykes, 433 U.S. 72 (1977), the Supreme Court held that a defendant's

15  failure to make a timely contemporaneous objection under state law, absent a showing of cause

16  for the noncompliance and some showing of actual prejudice, barred habeas corpus review of the

17  claim.  Under California law, it is well-established that "the use of physical restraints in the trial

18  court cannot be challenged for the first time on appeal" and failure to object and make a record

19  waives the claim.  People v. Tuilaepa, 4 Cal.4th 569, 583 (1992).  In the instant case, as

20  recognized by the Court of Appeal, although Petitioner did not personally consent to the

21  shackling procedure, defense counsel did.[14]  (Opinion, at 12.)  Thus, the Court of Appeal clearly

22  found the claim to be waived.  The fact that the state court simultaneously chose to also address

23  the merits of the petition, does not defeat this finding.  Bennett v. Mueller, 322 F.3d at 580 ("A

24  state court's application of a procedural rule is not undermined where . . . the state court

25  simultaneously rejects the merits of the claim.").  Therefore, Petitioner defaulted his federal

26  claim in state pursuant to an independent and adequate state procedure rule, and this Court is

27

28       [14]  The state court found no basis for the proposition that Petitioner had to personally agree to the shackling
    in order to deem the issue waived.  (Opinion, at 12.)

barred from reviewing the claim unless Petitioner can demonstrate actual prejudice or that a failure to consider the claims will result in a fundamental miscarriage of justice. Petitioner has failed to demonstrate actual prejudice or a fundamental miscarriage of justice, nor can he do so because as explained below there is no merit to his claim.

 2. <u>Merits of Claim</u>

 As noted by the Court of Appeal, in the midst of the trial, the following exchange regarding the shackling of Petitioner took place:

> MR. TORRES [defense counsel]: The only thing that we'll be doing on our case is asking [Petitioner] to stand up and hold the pants or have him hold the pants up against his body. . . . If the Court allows that . . ., we're going to ask that he be unshackled so they won't be looking at the shackles that are tying his feet together.
> THE COURT: Is he shackled at the moment?
> MR. TORRES: Yeah, he sure is.
> THE COURT: I'm assuming - because the Court has not authorized it or directed that he be shackled, but you allowed that?
> MR. TORRES: Yeah, I have no problem with that, just as long at this point, the point that we request that he be unshackled so he can walk up here and allow the jury to view him. [¶] . . . [¶]
> THE COURT: Okay. Let me say this . . ., since this is the first time that I heard that Mr. Wyatt has been shackled, it is a good thing that I did not ask him to stand up and turn around during jury selection. I guess the point I want to make is, this is something you have taken up with the Sheriff's Department, that you have been in agreement with, and you're satisfied that these perspective jurors and jurors have not seen any shackling on the defendant?
> MR. TORRES: I'm not sure that they have not seen it, but I'm satisfied in talking to the deputy that the procedure is fine. I agreed to it. We're fine with that.
> THE COURT: Okay. Good enough. This is shackling down below the counsel table that does have a modesty curtain, right?
> MR. TORRES: Yes.

(RT 370-372.)

 In rejecting Petitioner's claim on direct appeal, the Court of Appeal held:

> Here, the record does not reflect violence, a threat of violence, or other nonconforming conduct by [Petitioner], or that the trial court made its own independent determination of the need for physical restraints. Accordingly, we normally would find an abuse of discretion. . . .
> In any event, were we to address the issue, we would find no prejudice. As the California Supreme Court explained in *People v. Tuilaepa*, *supra*, 4 Cal.4th at pages 583-584, "The guidelines imposed by *People v. Duran*, *supra*, 16 Cal.3d 282, 290, are intended, in large part, to avoid prejudice in the minds of jurors where a defendant appears or testifies in obvious restraints, or where the restraints deter him from taking the stand in his own behalf. We have consistently found an unjustified or unadmonished shackling harmless where there was no evidence it was seen by the jury. [Citations.] In [particular cases], we also found no

10

evidence the restraints influenced the defendant's decision not to take the stand."
    Here, there was no evidence [Petitioner's] shackles were seen by the jury. The table at which he was seated had a "modesty curtain"; significantly, the trial court itself was unaware [Petitioner] was shackled until defense counsel said something. Although defense counsel could not say with certainty that no jurors had seen the shackles, [Petitioner] points to nothing in the record to suggest otherwise or that, if seen, it was any more than a brief glimpse. "Prejudicial error does not occur simply because the defendant 'was seen in shackles for only a brief period either inside or outside the courtroom by one or more jurors or veniremen.' [Citation.]" (*People v. Tuilaepa*, *supra*, 4 Cal.4th at p. 584; *People v. Duran*, *supra*, 16 Cal.3d at p. 287, fn. 2.) There is nothing to suggest [Petitioner] was wearing shackles when his attorney had him stand and hold the black pants up to his body, or that the restraints were visible on the other occasions when defense counsel had him stand so witnesses could gauge his height. [Petitioner] did not testify, and there is no evidence he would have testified but for his restraints. (See *People v. Cox*, *supra*, 53 Cal.3d at p. 652.) Under the circumstances, and [Petitioner's] protestations to the contrary, "the procedures implemented could not have influenced . . . the . . . verdict. '[A]ny error was clearly harmless.' [Citations.]" (*Id.* at pp. 652-653.)

(Lodged Doc. No. 5; Opinion, at 11-13.)

An analysis of a trial court's decision to shackle a defendant throughout his trial properly begins with the Supreme Court's decision in <u>Illinois v. Allen</u>, 397 U.S. 337 (1970). In <u>Allen</u>, the Court set forth appropriate guidelines for maintaining judicial control of the courtroom. <u>Id</u>. at 351 (Douglas, J., dissenting). In a situation where the trial court is faced with a contumacious defendant, the Supreme Court held that the trial judge has at least three constitutionally permissible options. He may "(1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly." <u>Id</u>. at 343-44. Upon discussing the possibility of binding and gagging a defendant, the Court admonished that this option should be employed only "as a last resort." <u>Id</u>. at 344 ("But even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort."). The Court recognized that "the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant . . . ." <u>Estelle v. Williams</u>, 425 U.S. 501, 504-505 (1976), *quoting*, <u>Allen</u>, 397 U.S. at 344.

In <u>Holbrook v. Flynn</u>, 475 U.S. 560 (1986), the Supreme Court addressed the approach a reviewing court should take in examining a trial court's decision to employ shackling: "All a ... court may do ... is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the

1   challenged practice is not found inherently prejudicial and if the defendant fails to show actual

2   prejudice, the inquiry is over." Id. at 572.

3       The Fifth and Fourteenth Amendment prohibit use of physical restraints absent a finding

4   by the trial court that the restraints are justified by a state interest specific to a particular trial.

5   Deck v. Missouri, 544 U.S. 622, 629 (2005).  Thus, in order to justify shackling a defendant,

6   "[f]irst the court must be persuaded by compelling circumstances that some measure was needed

7   to maintain the security of the courtroom.  Second the court must pursue less restrictive

8   alternatives before imposing physical restraints."  Morgan v. Bunnell, 24 F.3d 49, 51 (9th Cir.

9   1994).  In order to relief by way of habeas corpus, the petitioner must demonstrate that the

10  physical restraints "had a substantial and injurious effect or influence in determining the jury's

11  verdict."  Gonzalez v. Pliler, 341 F.3d 897, 903 (9th Cir. 2003) (quoting Brecht v. Abrahamson,

12  507 U.S. 619, 623) (1993) (citation omitted).

13      A jury's brief or inadvertent glimpse of a defendant in physical restraints outside of the

14  courtroom has not warranted habeas relief.  Ghent v. Woodford, 279 F.3d 1121 (9th Cir. 2002);

15  see also United States v. Halliburton, 870 F.2d 557, 560-561 (9th Cir. 1989); Wilson v.

16  McCarthy, 770 F.2d 1482, 1485-86 (9th Cir. 1985).

17      Here, although the trial court did not independently determine whether the physical

18  restraints were necessary, Petitioner has failed to demonstrate any resulting prejudice.  There is

19  no evidence in the record or suggestion that any of the jurors observed the shackles on Petitioner.

20  Specifically, as noted by the Court of Appeal, "[t]here is nothing to suggest [Petitioner] was

21  wearing shackles when his attorney had him stand and hold the black pants up to his body, or that

22  the restraints were visible on the other occasions when defense counsel had him stand so

23  witnesses could gauge his height."  (Opinion, at 12; see RT 183, 188, 212, 294, 301-302, 361-

24  362.)   In fact, in the midst of trial, even the Court was unaware that Petitioner was placed in

25  physical restraints.  (RT 371-372.)  Only visible shackling is inherently prejudicial.  See Deck v.

26  Missouri, 544 U.S. at 635.  Nor is there any evidence that Petitioner was unable to participate in

27  his defense.  The state court rejection of this claim was not contrary to clearly established Federal

28  law, as determined by the Supreme Court of the United States, nor did the state court resolution

result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. <u>See</u> 28 U.S.C. § 2254(d). Therefore, the claim should be denied.

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The instant petition for writ of habeas corpus be DENIED; and

2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendations is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


 IT IS SO ORDERED.

**Dated:      February 8, 2007**                                            **/s/ Sandra M. Snyder**
icido3                                                               UNITED STATES MAGISTRATE JUDGE